# ORIGINAL

F I L E D
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

JUL 3 1 2006

DAVID J. MALAND, CLERK
BY
DEPUTY _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | Case No.: 4:06 CV 311 |
| | § | |
| vs. | § | |
| | § | |
| JAMES R. POWELL, RALPH MITCHELL, | § | |
| MARK J. CORJAY, MICHAEL D. SCANNELL, | § | |
| and E. SUZANNE GARRETT | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT

The United States Securities and Exchange Commission ("Commission") files this Complaint against Defendants James R. Powell, Ralph Mitchell, Mark J. Corjay, Michael D. Scannell and E. Suzanne Garrett and would respectfully show the Court as follows:

## SUMMARY

1.      The Commission files this suit to hold accountable persons involved in an earnings enhancement scheme conducted by Daisytek International Corporation ("Daisytek" or the "company"), an office product and computer supply distributor and Fortune 1000 company. James R. Powell, Daisytek's former Chief Executive Officer, and Ralph Mitchell, Daisytek's former Chief Financial Officer, devised and conducted the scheme in an effort to make it appear that the company was meeting or exceeding analysts' earnings estimates. In fact, Daisytek was not legitimately meeting those expectations and "gaps" existed between Daisytek's actual business performance and the performance Powell publicly forecasted in inflated projections.

2.      With Powell and Mitchell's knowledge, and on several occasions at Powell's specific insistence, high-level Daisytek personnel engaged in fraudulent purchasing and

accounting practices to fill the gap between Powell's unrealistic projections and Daisytek's actual performance. Mark J. Corjay, Daisytek's former controller, was instrumental in the scheme, for his knowingly recording fraudulent revenue. Both E. Suzanne Garrett, Daisytek's former executive vice president – merchandising division, and Michael D. Scannell, Daisytek's former executive vice president and former president of Daisytek's U.S. Operations, were directly responsible for Daisytek's improperly recording as revenue various rebates associated with inventory they ordered for the sole purpose of meeting Powell's earnings targets.

3.     These fraudulent transactions were material. Without them, Daisytek would have missed, in a number of fiscal quarters and for the fiscal years-ended 2001 and 2002, analysts' consensus earnings estimates. Powell, Mitchell, Corjay, Garrett and Scannell knew that the fraudulent scheme was enabling the company to meet analysts' expectations. Besides actively promoting the scheme, Powell and Mitchell also forestalled its discovery by withholding from Daisytek's audit committee and auditor a documented account of the fraud prepared by a whistleblower, George Maney – at the time, the Chief Financial Officer of Daisytek's U.S. Operations. Powell and Mitchell's concealment enabled them to continue the scheme through the second quarter of 2003.

4.     Powell and Mitchell presented the company's inflated earnings figures in Daisytek's Commission filings, earnings releases and in quarterly analysts' conference calls. Powell and Mitchell signed the misleading Commission filings and both reviewed and authorized the misleading earnings releases. In the conference calls and releases, Powell and Mitchell both discussed Daisytek's earnings per share ("EPS") for the particular quarter, and in most instances, noted that the EPS had met or exceeded the analysts' consensus estimates.

5.     The Commission, in the interest of protecting the public from any further illegal activity, brings this action against the Defendants seeking permanent injunctive relief, officer and director bars, disgorgement of illicit profits and benefits Defendants received, plus accrued prejudgment interest, and civil monetary penalties.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to § 22(a) of the Securities Act of 1933 (the "Securities Act") and § 27 of the Securities Exchange Act of 1934 (the "Exchange Act").  Defendants, directly and indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in connection with the acts, practices and courses of business described in this Complaint.  Venue is proper because many of the transactions, acts, practices and courses of business described below occurred within the jurisdiction of the Eastern District of Texas.

## PARTIES

7.     **James R. Powell** resides in Dallas, Texas.  From 2000 to 2003, Powell was a board member and the president and Chief Executive Officer of Daisytek.  He resigned his Daisytek positions on May 5, 2003.

8.     **Ralph Mitchell** resides in Annandale, New South Wales (a suburb of Sydney, Australia).  From 2000 to 2003, Mitchell, an Australian chartered accountant, was Daisytek's Chief Financial Officer.

9.     **Mark J. Corjay** resides in Garland, Texas.  From 1994 to 2003, Corjay was Daisytek's controller. He is licensed in Oklahoma as a certified public accountant.

10.     **E. Suzanne Garrett** resides in Carpinteria, California.  From 2000 to 2001, Garrett was Daisytek's executive vice president over the merchandising division.

11.     **Michael D. Scannell** resides in Dallas, Texas. From 2001 to 2002, Scannell was executive vice president for Daisytek's U.S. Supplies; from 2002 to 2003, he was executive vice president and president of Daisytek's U.S. Operations.

## FACTUAL BACKGROUND

12.     Daisytek, a Delaware corporation based in Allen, Texas, was previously listed on NASDAQ. On May 7, 2003, Daisytek filed a voluntary petition under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

13.     Prior to filing for bankruptcy, Daisytek was engaged in the sale and distribution of office products and computer supplies, both in the United States and internationally. On January 20, 1995, Daisytek registered its common stock with the Commission. On June 6, 2003, the NASDAQ de-listed Daisytek's stock and on March 30, 2004, Daisytek filed a Form 15-12G to de-register its common stock with the Commission. On January 24, 2005, Daisytek consented to a cease-and-desist order based on the company's violations of the antifraud, reporting, record keeping, and internal control provisions of the federal securities laws which arose from the earnings management scheme created and implemented by the Defendants.

## The Scheme

14.     In 2000, Powell became the president and CEO of Daisytek. Daisytek had just spun off a profitable Internet subsidiary, and Daisytek's prior president, CEO, and chairman of the board left Daisytek to head the subsidiary. Powell, at the time, believed Daisytek was "a sinking ship – Daisytek's business was in decline, and profitability was deteriorating." Powell was determined to reverse the company's fortunes, and made public statements to that effect.

15.     From the inception of his leadership role at Daisytek, Powell was concerned about his credibility with the company's analysts, and the reliability of his predictions about the company's future. For example, on January 24, 2000, Powell sent an e-mail to Corjay, Garrett and others discussing the $1.8 million EBT (earnings before taxes) shortfall already evident in the first month of Daisytek's fourth quarter of 2000. Powell stated that he had a conference call scheduled with analysts the following week, and that he "must be able to communicate [Daisytek's] commitment to the numbers." In the e-mail, Powell emphasized his belief that his credibility was at risk.

16.     Powell, after he assumed the CEO position, announced publicly that Daisytek's earnings "would grow [in the] mid-single digits" and also projected publicly that Daisytek would achieve revenue and earnings growth for fiscal year 2001 through the end of fiscal year 2003. To support his optimistic projections, Powell reverse-engineered the company's internal revenue and earnings projections – a process referred to within the company as the "budget shove." To facilitate the process, Powell and Mitchell awarded bonuses to Daisytek employees who achieved the pre-determined results; conversely, Powell and Mitchell terminated employees who failed. Powell and Mitchell also received bonuses pursuant to their employment agreements when Daisytek achieved analysts' EPS estimates.

17.     Despite the high pressure culture fostered by Powell and Mitchell, gaps persisted between Daisytek's actual operating results and Powell's unrealistic projections. The accounting department generated and circulated daily "flash reports" reflecting the company's actual operating performance. From the flash reports, Powell and Mitchell determined the size of the gap between Daisytek's actual and projected results. Throughout the final weeks of each fiscal quarter, Powell held daily meetings at which he pressed managers and employees to "fill the

gap." This led to a practice known as "booking to budget." The practice involved, on a monthly basis, recording, in addition to actual revenue and expense amounts, fictitious "budgeted" revenue and expense amounts. Powell and Mitchell discussed with Daisytek management a variety of methods for "legitimizing" the sham numbers; and approved methods – both legitimate and fraudulent – were then compiled into an "up-side list." The individual managers identified which items on the up-side list they would attempt to accomplish. The phrase "true-up process" was coined for this practice, which Garrett referred to as "the Daisy Way."

18.     As a distributor, Daisytek was in the business of purchasing goods from original equipment manufacturers (commonly called "vendors") and, reselling those goods to retail establishments. Daisytek's written agreements with vendors offered incentives to the company to purchase large quantities of the vendor's goods, and create demand for those goods. There were three types of incentives: rebates, marketing development funds ("MDF"), and co-operative advertising funds ("Co-op funds"). Rebates are discounts off the purchase price of goods in amounts proportionate to the quantity of goods purchased by the distributor. MDF is a vendor payment to a distributor for the distributor's efforts to create a market for the vendor's goods. Co-op funds are similar to MDF payments, except that vendors typically pay Co-op funds for specific activities the vendor directs the distributor to undertake, whereas MDF payments are for general marketing activities over which the distributor typically has more discretion. All of these vendor-offered incentives – rebates, MDF, and Co-op funds – directly increased Daisytek's net income in the quarter they were recognized.

19.     Daisytek's agreements with its vendors provided that vendor rebates to Daisytek would increase in proportion to Daisytek's purchase of additional goods from the vendor. Daisytek's vendor agreements also offered MDF and Co-op funds. The amount of these funds

available to Daisytek was either specifically negotiated by Daisytek and the vendor, or equaled a pre-determined percentage of the amount of goods Daisytek purchased from the vendor; these amounts were set aside as a "pool" from which the MDF and Co-op payments were to be made in consideration for Daisytek's marketing the vendor's goods. The amount of rebate, MDF, or Co-op funds Daisytek earned was usually reflected in a credit memo, prepared by the vendor. Daisytek then used the credit memo it received from the vendor to offset amounts it owed the vendor. Sometimes, instead of applying the amounts as an offset against costs, vendors paid the MDF and Co-op funds with a check.

20.    Pursuant to Generally Accepted Accounting Principles ("GAAP"), Daisytek was required to recognize rebates associated with inventory purchases as a "reduction of the cost of goods." Thus, Daisytek could recognize rebates only as the inventory was sold. Daisytek, however, could recognize MDF and Co-op funds immediately if Daisytek performed the agreed marketing activities. Under GAAP, Daisytek could recognize as income MDF and Co-op funds as long as Daisytek had an agreement with the vendor for payment and Daisytek had performed the marketing services set forth in the agreement. To bolster Daisytek's earnings, the Defendants mischaracterized rebates as MDF, which the company immediately – and improperly – recognized as profit. After Daisytek's internal auditor began questioning this practice, Daisytek employees, pursuant to Powell and Scannell's directives, asked vendors to issue credit memos mischaracterizing the rebates as MDF.

21.    At the end of each quarter, Daisytek would approach its vendors "hat in hand… looking for ways to meet [Daisytek's] quarterly objectives." In response, the company's vendors offered Daisytek "special deals" in the form of inventory purchase incentives, typically larger rebates. These "special deals" enabled the vendor to sell more goods to Daisytek than Daisytek

would have purchased under the standard agreement between them.  Upon making these large quarter-end inventory purchases, Daisytek immediately recorded the rebates as revenue, mischaracterized as MDF, or as reductions to the cost of goods sold, in the same quarter Daisytek "purchased" the goods.  In some instances, the rebates, mischaracterized as MDF, were recognized at the quarter-end periods when the goods were ordered, but prior to delivery or payment, which occurred in the following quarter.  Recognizing the rebates in this manner violated the GAAP requirement that costs and revenues must be matched.

22.     In many instances, Daisytek accepted its vendors' special deal offers, and purchased inventory that the company knew it would be unable to re-sell profitably to its customers for the sole purpose of enhancing the company's earnings.  Over time, this practice resulted in Daisytek's accumulating increasing amounts – and increasingly obsolete amounts – of inventory.  Daisytek's optimal inventory turnover period was 14 to 30 days.  The company's bank agreements defined "obsolete inventory" (which was excluded from Daisytek's borrowing base) as any assets in inventory for more than 100 days.  Daisytek applied a "return on investment" test in deciding whether to accept a vendor's special deal: the test was used to determine whether the additional profit derived from the rebate offered outweighed the additional costs to Daisytek associated with making the purchase.  If the return on investment was satisfactory, Daisytek would purchase the additional inventory at quarter end, even if the purchase resulted in Daisytek's retaining existing inventory in excess of 100 days.

23.     The large, quarter-end inventory purchases negatively affected Daisytek's liquidity and operations.  These purchases typically involved goods that were unnecessary for Daisytek's operations, but on which manufacturers provided large rebates because the goods sold slowly.  As a result, Daisytek exhausted its capital through purchases of slow-moving goods.  In

some cases, Daisytek had well in excess of a two-year supply of goods that were subject to obsolescence and price decreases. At fiscal year-end 2001, Daisytek reported inventory of $83.6 million; at year-end 2002, $115.4 million; and at the quarter ended December 31, 2002, inventory of $190.7 million.

24.    The quarter-end inventory purchases impaired Daisytek's ability to operate profitably.    Daisytek had to continue making inventory purchases to meet its earnings projections. Since Daisytek could not sell the slow-moving goods, Daisytek eventually depleted its operating capital. As a result, Daisytek's liquidity was so negatively affected that its suppliers placed it on credit hold in late 2002 and early 2003. At that point, Daisytek could neither purchase the inventory it needed to meet customer demands, nor profitably sell its excess inventory of slow-moving goods. Its business quickly unraveled.

### The Specific Transactions and False Statements

### *Fourth Quarter of Fiscal 2001*

25.    The Trading Company was a division of Daisytek that obtained computer supplies from "gray sources," which were individuals or companies not affiliated with vendors. Gray sources of goods sell inventory "as is." Vendors, on the other hand, offer customers (including distributors like Daisytek) price protection, which allows the customer to return goods or receive an additional discount from the vendor if the vendor lowers the price of its goods. This protects the vendor's customers (such as Daisytek) from stocking goods at a price that is higher than the customer will be able to sell the goods in the future. Typically, gray source providers do not provide price protection, and do not accept returned inventory.

26.    For the quarter ended March 31, 2001, the fourth quarter of Daisytek's fiscal year in 2001, Mitchell instructed Corjay to record a $700,000 receivable for the Trading Company as

"price protection."   At the time Corjay made this accounting entry, Daisytek had no documentation or agreement with any gray source provider to support the entry.

27.    In 2001, Daisytek fabricated receivables in the form of sham vendor allowances to offset corporate expenses Daisytek incurred for office parties and business travel.   While consolidating the March 31, 2001, (fiscal year-end 2001) financial results, Corjay, without supporting documentation, recorded a $200,000 receivable from Hewlett Packard in connection with Daisytek's year-2000 Christmas party, and a $100,000 receivable for a trip Daisytek employees took to San Antonio in January 2001.   Although Daisytek did not have an agreement with Hewlett Packard to pay for the events, Garrett instructed Corjay to record them anyway, claiming that she would persuade Hewlett Packard to pay.   In fact, Garrett never sent an invoice to Hewlett Packard, and Hewlett Packard never made a payment for either event.   Corjay knew at the time he recorded the amount that there was no supporting documentation, and that he was responsible for the improper accounting entry.   The receivables were ultimately written off.

28.    Daisytek's 2001 Form 10-K, filed with the Commission on June 27, 2001, and signed by Powell and Mitchell, overstated Daisytek's fourth quarter, 2001 GAAP EPS by 23.5%, and its fiscal year 2001 GAAP EPS by 5.9%.   Daisytek reported GAAP EPS in its Commission filings.   Analysts' earnings estimates, however, were based on adjusted EPS, which omitted non-recurring one-time charges.   Daisytek, therefore, disclosed adjusted EPS in its earnings announcements and public conference calls.   Due to the material earnings impact of the fraudulent activity, all of Daisytek's EPS disclosures – both GAAP and adjusted – were false and misleading.

29.    Corjay compiled the earnings data disclosed in Daisytek's filings, releases, and teleconferences.   As Corjay calculated Daisytek's results, he shared them with Powell and

Mitchell.  On April 19, 2001, Corjay sent Powell and Mitchell an e-mail, in which he said that Daisytek's EPS for the fourth quarter of 2001 was 28 cents, and for the fiscal year 2001 was $1.00.  Powell responded, "What will it take for us to get to $1.01?"  The answer to Powell's question was found in the form of an accounting entry for the non-existent Trading Company "price protection" and the improper accounting of the Christmas Party and San Antonio trip. Daisytek announced adjusted earnings of 29 cents for the fourth-quarter, and $1.01 for fiscal year 2001.  Without the Hewlett Packard Christmas party and San Antonio trip receivables, Daisytek would have missed its earnings target for year-end 2001.  These receivables – which were subsequently written off – contributed 1 cent of EPS, which enabled Daisytek to reach a year-end $1.01 EPS.

30.     Daisytek announced its earnings for the fourth quarter of 2001 on May 9, 2001. The earnings release was titled, "Daisytek Reports Record FY2001 and Fourth Quarter Revenues."  It stated, "Earnings per share (diluted) for the fourth quarter were $0.29, up 38% from earnings per share of $0.21 in the prior year."  The earnings release also stated, "Diluted EPS growth from $0.77 per share in FY 2000 to $1.01 per share in FY 2001."  The false earnings information was also provided to analysts during Daisytek's May 9, 2001, teleconference.  On the call, Powell stated, "Diluted earnings per share for the quarter were 29 cents."  Mitchell elaborated on this point: "Very pleasing to report, obviously for Jim and I to report, that at the end of the first year of the new Daisytek, net income in earnings for the full year were at the upper end of expectations...  Diluted earnings per share were 29 cents for the [fourth] quarter, compared to 21 cents a year ago, and it was a $1.01 for the full year 2001, compared to 77 cents for last year."  Corjay moderated this teleconference, but did not attempt to correct Powell or Mitchell's statements during or after the teleconference.

31.     Without improperly recognizing revenue as discussed above, Daisytek would have missed the analysts' EPS estimate for the quarter and for the year.  Daisytek's adjusted diluted EPS for the quarter was actually $0.25 per share, not the reported $0.29 (16% lower); and Daisytek's adjusted diluted EPS for the year 2001 was actually $0.97, approximately 4% lower than the reported $1.01.  Powell, Mitchell, and Corjay were aware that these earnings figures were inaccurate, and that, without the improper accounting, Daisytek would have missed the analysts' EPS estimate.

### *First Quarter of Fiscal 2002*

32.     Garrett made a purchase at the end of the first quarter of 2002; the rebate offered on the purchase was accounted for on the Trading Company's books.  Garrett directed Corjay to record the rebate as MDF, even though she had obtained no documentation from the vendor to support characterizing the rebate as MDF.  Upon Garrett's instruction, Corjay recorded the $147,000 rebate as MDF.  Corjay told Garrett that he would make the accounting entry, and that Garrett could provide Corjay with documentation at a later date.  By mischaracterizing the rebate as MDF, Daisytek immediately recognized the rebate as profit.  Garrett never provided Corjay with supporting documentation for this entry and Corjay took no steps to reverse the entry.

33.     Corjay made accounting entries in the first quarter of 2002 that, by recording purported sales of inventory, converted $240,000 of inventory reserve into profit.  In effect, Corjay's entries shifted the value of inventory Daisytek had on hand in its Memphis warehouse to "profit" generated by putative sales in the Daisytek Trading Company.  He did this by reducing (debiting) the inventory reserve account by $240,000, and also reducing the cost of sales account by $240,000.  In fact there was no sale of the inventory, and therefore no economic justification for the entries.

34.     Corjay recorded $560,000 of profit associated with a vendor program pursuant to which Daisytek allowed vendors to access its inventory system for a fee. The circumstances at the time militated against Corjay's recording the profit: 1) the system was not operational; 2) Daisytek had not sent any invoices to vendors requesting payment for use of the inventory system; 3) no vendors had paid Daisytek any access fees; and 4) Daisytek had no supporting documentation for the entry.    Moreover, George Maney, the CFO for Daisytek's U.S. Operations, sent an e-mail to Mitchell questioning the propriety of recognizing this revenue as profit.    Without attempting to justify his action, Mitchell told Maney to refrain from memorializing these types of questions in writing, and that he would not reverse the entry.

35.     Garrett instructed an accounting clerk to change internal Daisytek records to show that Daisytek had earned $600,000 more in Co-op profit than Daisytek actually earned. According to Corjay, the Co-op money was associated with a Daisytek marketing program for Hewlett Packard.   In fact, at the time the Co-op revenue was recognized, Daisytek had not performed any marketing activities for Hewlett Packard.   It was therefore inappropriate for Daisytek to recognize the revenue.

36.     Daisytek announced its earnings for the first quarter 2002 on August 8, 2001.  The earnings release was titled, "Daisytek Reports 27% Increase in Earnings for First Quarter 2002." It stated, "Diluted earnings per share for the first quarter were $0.28 (before certain incremental charges), up 27% from earnings per share of $0.22 in the same prior year period."  The same figures that overstated Daisytek's GAAP EPS by 140% were included in the first quarter 2002 Form 10-Q Daisytek filed with the Commission on August 14, 2001.

37.     The false earnings information was also provided to analysts and the investing public during Daisytek's August 8, 2001, teleconference.   On the call, Powell stated, "I hope

everyone has had a chance to review our press release issued this morning. We are very proud to announce that the Daisytek team has delivered our fifth consecutive quarter of beating expectations." Powell also stated, "Earnings per share for the quarter were 28 cents, an increase of over 27% compared to the same period last year." Investors were not told, however, that but for the false entries, Daisytek would have missed by five cents the analysts' estimated EPS. Corjay moderated, and Mitchell attended, this teleconference, but neither of them attempted to correct Powell's statements.

38.     Without the improperly recognized revenue, Daisytek's adjusted diluted EPS for the quarter was actually $0.21 per share (33.3% lower), five cents less than the analysts' EPS estimate. Powell, Mitchell, and Corjay were aware that these earnings figures were inaccurate, and were aware that, without the improper accounting, Daisytek would have missed the analysts' EPS estimate. Mitchell filed this announcement as an exhibit to Form 8-K on August 9, 2001; he also signed the Form 8-K.

### *Fourth Quarter of Fiscal 2002*

39.     In the fourth quarter of 2002, Powell directed Daisytek's product manager to order additional inventory so that Daisytek could meet its EPS estimate. Afterwards, the product manager approached Minolta-QMS, Inc. ("Minolta"), a Daisytek vendor. Minolta offered to give Daisytek a 35% rebate on certain goods. Daisytek's return on investment analysis indicated that Daisytek should not have purchased these Minolta goods, but Powell instructed the product manager to purchase the Minolta goods anyway. Consequently, the product manager purchased $2.8 million of Minolta goods in order to obtain the 35% rebate, or $980,000, which Daisytek mischaracterized as MDF and recognized immediately as profit. After this quarter-end purchase,

Daisytek had 395 days of Minolta inventory in stock, well in excess of what was considered "obsolete inventory."

40.     Daisytek's product manager addressed to Scannell (her immediate supervisor) her concerns about the Minolta purchase that Powell had instructed her to make.  Instead of confronting Powell about the improper inventory purchase, Scannell repeated Powell's instruction to buy the Minolta goods.  Scannell also instructed her to obtain credit memos from Minolta mischaracterizing the rebate as MDF.  Scannell told the product manager that if the credit memos indicated "rebate," Daisytek could not immediately recognize the rebate as profit, but would have to wait until the goods were sold; Scannell added that if the credit memos indicated "MDF," Daisytek could immediately recognize the rebate as profit.  In addition to the Minolta goods Powell demanded, Scannell instructed Daisytek's product manager to buy additional Minolta goods during this quarter.   Ultimately, Daisytek improperly recognized $1,540,000 of rebates as MDF in the fourth quarter of 2002.

41.     Daisytek's 2002 Form 10-K, signed by Powell and Mitchell and filed with the Commission on June 28, 2002, overstated Daisytek's 2002 fourth quarter GAAP EPS by 37.5%, and its fiscal-year 2002 GAAP EPS by 23.6%.   The improper conduct discussed above contributed six cents of EPS in the fourth quarter of 2002, and thirteen cents of EPS for the fiscal year.  Moreover, Daisytek falsely described its inventory purchasing policy.  Daisytek's Form 10-K specifically stated "Our purchases of inventory generally are closely tied to sales and are usually based upon the sales volume of the most recent six to ten week periods.... Daisytek manages its inventories held for sale in its core wholesale distribution business by maintaining sufficient quantities of products to achieve high order fill rates while at the same time maximizing inventory turnover rates."   In fact, as described in this Complaint, many of

Daisytek's inventory purchases bore no relation to historical sales or to any effort to maximize inventory turnover rates.

42.    Daisytek announced its earnings for this period on May 7, 2002.  The earnings release was titled, "Daisytek Q4 Earnings Up Over 20%; Revenue Growth of 23%; Fourth Quarter Performance has Company on Track for Continued Growth."  It stated, "Daisytek... today announced fourth quarter net income from continuing operations of $5.2 million, and diluted earnings per share of $0.27, excluding special charges.  Current quarter diluted earnings per share of $0.27 (on 19.2 million shares) compares to prior year diluted earnings per share of $0.28 (on 15.1 million shares)."  Without the improperly recognized revenue, Daisytek's adjusted diluted EPS for its fourth quarter was actually 21 cents per share (28.6% lower), seven cents less than the analysts' $0.28 EPS estimates.  Moreover, Daisytek's adjusted diluted EPS for the year was actually 90 cents (14.4% lower), fourteen cents less than analysts' $1.04 EPS estimates.  Although Daisytek's announced earnings were improperly inflated, it still missed analysts' consensus earnings estimates by one penny for the quarter, and one penny for the year. Powell believed that Daisytek's failure to meet analysts' expectations by even on penny per share in earnings would have been catastrophic.  He was correct.  Daisytek's failure in the fourth quarter to meet the analysts' consensus earning estimates lead to a substantial decline in Daisytek's share price and a significant increase in trading volume in its securities.  The week before the earnings announcement, Daisytek's securities had been trading between $15 to $16 per share, and the volume was between 54,000 to 93,000 shares.  On May 7, 2002, the day Daisytek released its earnings results, Daisytek's stock price dropped to $14.55, and its volume rose to 329,406; a 3% to 9% drop in share price, and a 254% to 510% increase in volume.  The share price did not rebound to pre-announcement prices until May 17, 2002.

43.   Without the improper accounting entries, however, Daisytek would have missed the analysts' estimates for the quarter by seven cents, and for the year by fourteen cents. Powell, Mitchell, and Corjay were aware that these earnings figures were inaccurate, and that without the improper accounting, Daisytek would have missed the analysts' EPS estimate by a larger amount. Mitchell filed this announcement as an exhibit to Form 8-K on May 7, 2002, and also signed the Form 8-K.

44.   The false earnings information was also provided to analysts and the investing public during Daisytek's May 7, 2002, teleconference. On the call, Powell stated, "Diluted earnings per share were 27 cents, excluding special charges. The current quarter's diluted earnings per share of 27 cents are on 19.2 million shares compared to last year's 28 cents on 15.1 million shares for last year. EPS for the full year was $1.03 compared to 98 cents for last year." Mitchell elaborated on this point: "Equivalent EPS was 27 cents, versus 28 cents a year ago. For the full fiscal year, therefore, our adjusted, fully diluted EPS from continuing operations was $1.03 versus a comparable 98 cents for the prior year." Investors were not told, however, that six cents of the reported EPS for the quarter, and 13 cents of the reported EPS for the fiscal year, were derived from inappropriate accounting entries. Corjay moderated this teleconference, but did not attempt to correct Powell or Mitchell's statements during or after the call.

### *First Quarter of Fiscal 2003*

45.   In June 2002, Maney and Paula Simon (at the time controller of Daisytek's U.S. Operations) recommended to Mitchell that Daisytek record an expense to rectify Daisytek's under-accrued freight expenses. Simon subsequently recorded $1.2 million of freight expenses in the first quarter of 2003. To offset part of this entry's negative impact, Corjay instructed an accounting clerk, on July 11, 2002, to record a $600,000 receivable from Federal Express

("FedEx").  Powell had told Corjay to record this receivable, assuring Corjay that he (Powell) would obtain the money from FedEx.  There was no documentation to support this entry.  Powell intended to approach FedEx's CEO to discuss the matter.  Powell's position was that FedEx should retroactively apply the new shipping rates to the date Daisytek's previous contract with FedEx expired.  This would have resulted in FedEx's refunding to Daisytek approximately $600,000.  FedEx never paid Daisytek any portion of the $600,000.

46.     At the end of this quarter, Scannell instructed Daisytek's product manager to purchase an additional $3 million of Minolta goods to meet analysts' first quarter, 2003 EPS estimates.  This purchase yielded Daisytek an additional $1.05 million in rebates.  Scannell also instructed the product manager to obtain credit memos from Minolta mischaracterizing the rebates as MDF.  The March 31, 2002, and June 30, 2002, quarter-end purchases provided Daisytek with over $2.5 million in purported rebate revenue, which Daisytek mischaracterized as MDF, and recognized immediately as profit.

47.     Daisytek announced its earnings for this period on August 7, 2002.  The earnings release was titled, "Daisytek Earnings Beat Expectations, Revenue Grows 47% U.S., Australia, Canada, Mexico, U.K. Deliver Solid Performance."  It stated, "Daisytek... announced first quarter... diluted earnings per share of $0.19, excluding special charges.  Corresponding first quarter diluted earnings per share of $0.19 (on 19.4 million shares) compare to prior year diluted earnings per share of $0.28 (on 16.0 million shares)."  The false information was also included in Daisytek's first quarter, 2003 Form 10-Q.  Powell and Mitchell signed the Form 10-Q.

48.     Without the improperly recognized revenue, Daisytek's adjusted diluted EPS for the first quarter of 2003 was actually thirteen cents (46.2% lower), six cents less than the analysts' EPS estimate and the EPS presented in the earnings release.  Powell, Mitchell, and

Corjay were aware that these earnings figures were inaccurate, and that without the improper accounting, Daisytek would have missed the analysts' EPS estimate.   Mitchell filed this announcement as an exhibit to Form 8-K on August 9, 2002.

49.    The false earnings information was also provided to analysts during Daisytek's August 7, 2002, teleconference.  On the call, Powell stated, "Diluted earnings per share were 19 cents, excluding special charges.  The current quarter's diluted earnings per share of 19 cents is on 19.4 million shares, compared to last year's 28 cents on 16 million shares."   Mitchell elaborated on the earnings information: "Equivalent EPS was 19 cents versus 28 cents a year ago.  In addition to [consolidating an acquired entity], it's worth noting that our fully diluted share count has risen significantly over the last year, from 16 million a year ago to 19.4 million at the moment.... Our GAAP EPS from continuing operations rose to 12 cents versus 11 cents a year ago."  Investors were not told, however, that six cents of the reported EPS for the quarter was derived from inappropriate accounting entries, and that without the entries, Daisytek would have missed the analysts' EPS estimate by six cents.

### *Second and Third Quarters of Fiscal 2003*

50.    At the end of the second fiscal quarter of 2003, Scannell told the product manager to buy office products in order to obtain $424,000 in rebates.  In the subsequent quarter (ending December 31, 2002), Scannell told the product manager to buy another $6 million of office products.  These two purchases, totaling approximately $12 million, provided Daisytek with several *years* of unnecessary on-hand inventory.  Daisytek was not planning to sell these products until fiscal year 2004.  Daisytek immediately recognized the rebates on the office products as MDF in the quarters they were purchased.

51.   In addition to this $12 million of unnecessary inventory purchased at the end of the second quarter of 2003, Daisytek's product manager bought additional inventory in the quarter – pursuant to Scannell's instructions – once again, for the sole purpose of improperly recording rebates as revenue and increasing Daisytek's earnings.   Despite these accounting improprieties, Daisytek missed the analysts' earnings estimates in this quarter.   The purchases and rebates were as follows:

- $1,140,000 of Maxell goods to obtain $44,191 in rebates.  Daisytek already had a 120-day supply;

- $270,000 of Xerox goods to obtain $15,000 in rebates. Daisytek already had a 63-day supply;

- $500,000 of Fuji goods to obtain $41,800 in rebates.  Daisytek already had a 140-day supply;

- $439,000 of Brother goods to obtain $44,340 in rebates, which gave Daisytek a 95-day supply;

- $185,000 of Apple goods to obtain $20,350 in rebates, which gave Daisytek a  85-day supply;

- $135,000 of TrippLite goods to obtain $12,000 in rebates, which gave Daisytek a 448-day supply; and

- $80,000 of Belkin goods to obtain $8,000 in rebates, which gave Daisytek a 556-day supply.

### Ignoring and Silencing Whistleblowers

52.   Two Daisytek employees, Robert Clark, vice-president of Product Management for Daisytek's U.S. Operations, and George Maney, CFO of Daisytek's U.S. Operations, became concerned about the company's improper revenue recognition practices.   Believing he was revealing undiscovered misconduct, Clark addressed his concerns to Powell in the fall of 2001. In the spring of 2002, when Clark again raised concerns, Powell lied to Clark, telling him that Daisytek had conducted an internal audit to investigate his concerns, and that, as a result of the

audit findings, Daisytek had corrected its practices. In fact, Daisytek had not conducted an audit, nor had it remedied the quarter-end buying and improper accounting for rebates that Clark had identified the previous fall. Shortly thereafter, Powell reassigned Clark to assist with Daisytek's mergers and acquisitions.

53.     In the summer of 2001, Maney compiled a report (the "Maney Report") documenting what he also believed was an as yet undiscovered earnings enhancement scheme. In the report, Maney characterized the business practices as fraudulent, violative of GAAP, and the cause of Daisytek's filing misleading financial reports with the Commission. Maney presented the report to his immediate supervisor, John Cullen, at the time, president of Daisytek's U.S. Operations. Shortly thereafter, Maney and Cullen presented the Maney Report and suggested corrective actions to Powell, Mitchell, and Corjay in a meeting held in September 2001.

54.     Instead of discontinuing the scheme, Powell and Mitchell told Maney and Cullen that they did not "understand the business." In October 2001, Powell effectively terminated Cullen. In November 2001, Powell and Mitchell lied to Maney, by telling him that they had presented his concerns to Daisytek's audit committee, and that the committee did not credit his concerns. In fact, neither Powell nor Mitchell presented this material to Daisytek's board of directors or audit committee and continued to conceal the scheme from the investing public. Further, Daisytek's internal auditor also told Powell, Mitchell and Corjay in 2002 that they were improperly characterizing rebates as MDF. Powell, Mitchell and Corjay, similarly, told the internal auditor that he did not understand Daisytek's business. Rather, the Defendants continued to follow the "Daisy Way" and mislead investors through approving false accounting entries, filing false reports with the Commission and touting the false results to investors.

### Lying to Auditors

55.     As part of its normal auditing procedures, Ernst & Young required Daisytek management to provide management representation letters.  Powell, Mitchell and Corjay knew about the earnings management scheme and accounting improprieties at least as early as September 2001, when Maney and Clark presented to them their concerns.  Despite this, Powell, Mitchell, and Corjay signed management representations letters without disclosing Clark and Maney's allegations.

### False Sarbanes-Oxley Certifications

56.     Powell and Mitchell signed a Sarbanes-Oxley certification on August 14, 2002. The certification attested that the information contained in Daisytek's Form 10-Q for the period ended June 30, 2002, (Daisytek's first fiscal quarter of 2003) "fairly presents, in all material respects, the financial condition and result of operations of the Company."  At the time they signed the certification, Powell and Mitchell were aware that Daisytek's earnings enhancement scheme had materially impacted the financial results for that fiscal quarter.  Thus, the certification was false.

### Replicating the False Statements

57.     Daisytek offered and sold securities in 2001 and 2002, pursuant to registration statements on Form S-8 that the company filed with the Commission.  Daisytek incorporated by reference in the Forms S-8 its false Forms 10-Q and false Forms 10-K.  Moreover, Daisytek failed to disclose, in connection with those offerings, that Daisytek was managing and inflating its earnings.  Powell and Mitchell signed the Forms S-8.

### Deficient Internal Controls

58.     During the relevant period, Daisytek did not have internal accounting controls in place to ensure that: 1) revenue items were recorded only when the items had supporting documentation; 2) vendor allowances were properly recorded on its books; 3) inventory was properly valued and written off when damaged or obsolete; 4) adequate inventory and accounts receivable reserves were established; and 5) only accounting department personnel had the ability to make entries and changes to Daisytek's ledgers.   Internal reports, memoranda, and e-mails from Powell, Mitchell, and Corjay acknowledged poor accounting controls and procedures, and improper accounting practices.   Equally, Scannell and Garrett were also aware of Daisytek's poor internal controls and collectively all of the Defendants took advantage of the weakness of Daisytek's controls to facilitate the earnings management scheme.

## CLAIMS

### FIRST CLAIM
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

59.     Plaintiff repeats and incorporates paragraphs 1 through 58 of this Complaint by reference as if set forth *verbatim.*

60.     Defendants, in connection with the purchase or sale of securities, have:   (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

61.     Defendants engaged in the conduct described in this claim knowingly or with severe recklessness.

62.     By reason of the foregoing, Defendants violated, and unless enjoined, will continue to violate Section 10(b) of the Exchange Act.  [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM
### Violations of Section 17(a) of the Securities Act

63.     Plaintiff repeats and incorporates paragraphs 1 through 58 of this Complaint by reference as if set forth *verbatim*.

64.     Defendants, directly or indirectly, singly, in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have:  (a) employed devices, schemes or artifices to defraud;  (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit.

65.     As part of and in furtherance of this scheme, Defendants, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material fact and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those statements and omissions set forth in paragraph 1 through 58 above.

66.     Defendants made the above-referenced misrepresentations and omissions knowingly or with severe recklessness with regard for the truth.  Defendants were also negligent in their actions regarding the representations and omissions alleged herein.

67.     By reason of the foregoing, Defendants have violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM
### Violations of Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2

68.     Plaintiff repeats and incorporates paragraphs 1 through 58 of this Complaint by reference as if set forth *verbatim*.

69.     Defendants knowingly circumvented Daisytek's system of internal accounting controls and/or knowingly falsified Daisytek's books and records required to be kept under Section 13 of the Exchange Act. Additionally Defendants, directly or indirectly, made materially false or misleading statements, or omitted to state, or caused another person to omit to state, material facts necessary to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with an audit or examination of financial statements.

70.     By reason of the foregoing, Defendants violated, and unless enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2].

### FOURTH CLAIM
### Aiding and Abetting Violations of Section 13(a) of the
### Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13

71.     Plaintiff repeats and incorporates paragraphs 1 through 58 of this Complaint by reference as if set forth *verbatim*.

72.     Based on the conduct alleged herein, Daisytek violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.

73.     Defendants, in the manner set forth above, knowingly or, with severe recklessness, provided substantial assistance to Daisytek, as an issuer of securities registered

pursuant to Section 12 of the Exchange Act, in its failing to file with the Commission, in accordance with rules and regulations the Commission has prescribed, information and documents required by the Commission to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act and annual reports and quarterly reports as the Commission has prescribed.

74.     By reason of the foregoing, Defendants aided and abetted, and unless enjoined will continue to aid and abet, violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.  [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

## FIFTH CLAIM
### Aiding and Abetting Violations
### of Section 13(b)(2)(A) and (B) of the Exchange Act

75.     Plaintiff repeats and incorporates paragraphs 1 through 58 of this Complaint by reference as if set forth *verbatim*.

76.     Based on the conduct alleged herein, Daisytek violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

77.     Defendants, in the manner set forth above, knowingly or, with severe recklessness, provided substantial assistance to Daisytek in connection with its failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected Daisytek's transactions and dispositions of its assets.

78.     Defendants, in the manner set forth above, knowingly or, with severe recklessness, provided substantial assistance to Daisytek in connection with its failure to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances

that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

79.     By reason of the foregoing, Defendants aided and abetted, and unless enjoined will continue to aid and abet, violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.  [15 U.S.C. §§ 78m(b)(2)(A), (b)(2)(B)].

**SIXTH CLAIM**
**Violations of Rule 13a-14 of the Exchange Act**

80.     Plaintiff repeats and incorporates paragraphs 1 through 58 of this Complaint by reference as if set forth *verbatim.*

81.     Powell and Mitchell signed a Sarbanes-Oxley certification on August 14, 2002. The certification attested that the information contained in Daisytek's Form 10-Q for the period ended June 30, 2002, "fairly presents, in all material respects, the financial condition and result of operations of the Company."  At the time they signed the certification, Powell and Mitchell were aware that Daisytek's earnings enhancement scheme had materially impacted the financial results for that fiscal quarter.

82.     Exchange Act Rule 13a-14 requires an issuer's principal executive and financial officer to certify in each quarterly and annual report filed or submitted by the issuer under Section 13(a) of the Exchange Act, that: 1) they have reviewed the report; and 2) based on their knowledge, the report does not contain any untrue statement of material fact, or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report.  Powell and Mitchell knew or were reckless in not knowing that the reports they certified contained untrue statements of material fact and omitted to state material facts necessary to make

the statements made therein, in light of the circumstances under which the statements were made, not misleading.

83.    By reason of the foregoing, Powell and Mitchell violated, and unless enjoined, will continue to violate Rule 13a-14 [17 C.F.R. § 240.13a-14] promulgated under Section 302 of the Sarbanes-Oxley Act of 2002.

## PRAYER

The Commission respectfully requests that the Court:

84.    Permanently restrain and enjoin Defendants from violating, or aiding and abetting violations, directly or indirectly, the provisions of law and rules alleged in this Complaint.

85.    Order Defendants to disgorge all ill-gotten gains, plus pre-judgment and post-judgment interest, resulting from their participation in the alleged conduct, including salaries, bonuses, stock, or other compensation of any kind.

86.    Order Defendants to pay civil money penalties, plus post-judgment interest, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] in an amount to be determined by the Court.

87.    Order that Defendants, under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], are prohibited from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

88.     Grant such other relief as this Court may deem just or appropriate.

Dated: July 28, 2006                    Respectfully submitted,

HAROLD R. LOFTIN, JR.
Attorney-in-Charge
Texas Bar No. 12487090
U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX  76102-6882
(817) 978-6450
(817) 978-4927 (fax)
Loftinh@sec.gov